### SPOKANE & I. E. R. CO. v. CAMPBELL.

(Circuit Court of Appeals, Ninth Circuit. October 19, 1914.)

No. 2366.

1. MASTER AND SERVANT (§ 111*)—INJURIES TO SERVANT—RAILROADS—REGULATION—SAFETY APPLIANCE ACT—"LOCOMOTIVE ENGINE"—"ENGINEER."

Safety Appliance Act (Act Cong. March 2, 1893, c. 196, § 1, 27 Stat. 531 [U. S. Comp. St. 1913, §§ 8605–8612]), requires common carriers engaged in interstate commerce by railroad to equip their "locomotive engines" with power driving-wheel brakes, so that the "engineer" may control the speed without requiring brakemen to use the hand brakes for that purpose. By Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. 1913, §§ 8613–8615), such requirement was extended to all trains, locomotives, tenders, cars, and similar vehicles on any railroad engaged in interstate commerce. *Held*, that while the words "locomotive engines" and "engineer" as used in such act were primarily intended to refer to a steam-propelled engine. and to the operator thereof, respectively, such words were sufficiently broad to include an electric motor and the motorman, and that the act was therefore applicable to electric motors used to haul trains engaged in interstate commerce.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217, 255; Dec. Dig. § 111.*

For other definitions, see Words and Phrases, First and Second Series, Engineer, Locomotive.]

2. TRIAL (§ 359*)—SPECIAL VERDICT—REQUISITES.

Where the entire controversy is dependent on a special verdict, it will prevail only when it finds all the facts essential to a determination of every material issue in the case.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 857–860, 875, 877, 878; Dec. Dig. § 359.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. COURTS (§ 352*) — FEDERAL COURTS — RULES OF DECISION — LOCAL LAW — SPECIAL VERDICT.

Since the local law with reference to submitting special findings with a general verdict does not control the federal courts with respect to the mode in which causes are required to be submitted to a jury, such courts are not bound by the rules obtaining in the local courts for interpreting such verdict; the general rule being that the court, in determining what judgment shall be entered on a special verdict, will not look to the evidence, nor beyond the pleadings and the judge's record.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 926–932; Dec. Dig. § 352.*

Conformity of practice in common-law actions to that of state court, see notes to O'Connell v. Reed, 5 C. C. A. 594; Nederland Life Ins. Co. v. Hall, 27 C. C. A. 392.]

4. MASTER AND SERVANT (§ 297*)—INJURIES TO SERVANT—ACTIONS—GENERAL AND SPECIAL VERDICT—CONSTRUCTION—EFFECT.

In an action for injuries to an interurban motorman, engaged in interstate commerce, in a collision between his train and a regular train moving in the opposite direction, on a single track, the jury found a general verdict for plaintiff, a special verdict that plaintiff before starting on his run received a written train order directing him to meet a "special" moving in the opposite direction at A., and special findings that the air brakes on plaintiff's train failed immediately before the collision, and that plaintiff left his starting point in violation of orders, before the regular train arrived, which was the proximate cause of the accident. *Held*, that such latter finding was a mere conclusion of law and not a finding of fact, and since the element of proximate cause, where concurrent acts of the employer and employé contribute to cause the injury, is eliminated by the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. 1913, §§ 8657–8665]), and especially where the contributing act of the employer is in derogation of a duty imposed by the Safety Appliance Act, defendant was not entitled to a judgment on the special verdict.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1195–1198; Dec. Dig. § 297.*]

5. APPEAL AND ERROR (§ 977*)—NEW TRIAL (§ 6*)—QUESTIONS REVIEWABLE —DISCRETION OF COURT.

The grant or refusal of a new trial in the federal courts rests in the sound discretion of the trial court, and the result cannot be made the subject of reversal on a writ of error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3860–3865; Dec. Dig. § 977;* New Trial, Cent. Dig. §§ 9, 10; Dec. Dig. § 6.*]

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by Edgar E. Campbell against the Spokane & Inland Empire Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 188 Fed. 516.

On the afternoon of the 31st day of July, 1909, at about 4:30 o'clock, the defendant in error, plaintiff below, he being the motorman, started with his train of three cars—the motor car and two trailers—out of Cœur d'Alene over the electric line for Spokane. When he had proceeded a short distance from Cœur d'Alene, a mile and a half or two miles, he ran into another train coming in the opposite direction, whereby he was injured, and a number of passengers on his train lost their lives, while others were more or less injured. The train he was running was a special, known as No. 5, and he testifies that

he received written orders for running it, also oral orders from the conductor, and that he moved out on the line in pursuance of such orders; that when he had gotten out on the road some distance and observed the approaching train, he set the air brakes, which held for a short time only, then let go, supposedly by the escape of the air, and he thereby lost control of his train, and was unable to stop it or further check its speed. As a consequence he ran into the train coming from the other way, the latter train, however, having been brought to a stop before the collision. In this testimony plaintiff has corroboration.

According to the rules of the company, which were in evidence, a special train is expected to keep out of the way of the regular trains; that is to say, the special must take note of the schedule running time of all regular trains, and be on sidings at the stations where and when the regulars will pass, so as to allow a free track to the regulars. Specials are run on orders from the dispatcher with reference to another special, and the motorman is expected to make the passing stations as directed.

The defendant's testimony tends to show: That plaintiff, together with the conductor, was given and received a running order for No. 5 before leaving Cœur d'Alene station, directing No. 5 to meet No. 4 at Alan station, which order was in the following language: "Motor 5 will run Spl CD Alene to Spokane meet Spl 4 East at Alan." And, further, that the train was equipped with air brakes and other equipment for controlling and stopping the train, and that these had been properly and recently tested for determining their efficiency, and found to be in good order.

The cause having been tried before a jury, the following special and general verdicts were returned:

### "Verdict.

"We, the jury in the above-entitled cause, find for the plaintiff, and fix the amount of his damages at the sum of $7,500.00 (seventy-five hundred dollars)."

### "Special Verdict.

"Did the plaintiff Campbell receive, before leaving Cœur d'Alene, train order No. 53, reading as follows: 'Train Order No. 53. From Spokane 7—31—1909. To Motor 5 at C. D. Alene Station: Motor 5 will run Spl. C. D. Alene to Spokane meet special 4 east at Alan.' Yes."

### "Special Finding I.

"Q. Were the air brakes on Campbell's train immediately before the collision insufficient to enable Campbell to control the speed of the train? A. Yes."

### "Special Finding II.

"If you find that plaintiff left Cœur d'Alene in violation of his orders, then answer this question: Was that leaving in violation of his orders the proximate cause of the accident? Yes."

Motion was interposed for judgment in favor of defendant on the special findings, notwithstanding the general verdict, which was denied. Later a petition for a new trial was also denied, and judgment rendered for plaintiff. Error is prosecuted from this judgment.

Graves, Kizer & Graves, of Spokane, Wash., for plaintiff in error.

Belden & Losey, of Spokane, Wash., and H. Lowndes Maury, of Butte, Mont. (Henry R. Newton, of Spokane, Wash., of counsel), for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). Three questions are urged upon our attention: First, whether the

Safety Appliance Act of Congress has application to interstate electric railroads, it being contended that the defendant was not bound to equip its motors with air brakes; second, whether the trial court should have allowed the motion for judgment non obstante; and, third, whether the motion for new trial should have been granted.

[1] Section 1 of the Safety Appliance Act of Congress, March 2, 1893, requires common carriers engaged in interstate commerce by railroad to equip their locomotive engines with power driving-wheel brakes and appliances for operating the train-brake system, and to equip a sufficient number of cars in the train with power or train brakes so that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for the purpose. 27 Stat. 531. By an amendment of this statute (Act March 2, 1903, 32 Stat. 943) the provisions and requirements thereof relating to train brakes, automatic couplers, etc., are made to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and to all other locomotives, tenders, cars, and similar vehicles.

There can be no doubt that when the primary act was passed, electrically propelled trains were not within the legislative mind, and where "locomotive engine" occurs reference was had to a steam-propelled engine. And likewise when "engineer" is spoken of, it had relation to a person in charge of a steam-propelled locomotive. But this does not signify that other locomotive or motor engines, and that persons driving other motor cars, may not come within the scope and intendment of the act. The purpose of the Legislature was to provide, among other things, for a more efficient and effective way of handling trains in interstate commerce, so that the speed and movement of the train might be regulated and controlled, and, when desired and in cases of emergency, readily brought to a stop, all from the engine and by the one person in charge of it, thereby to lessen the danger to employés and the public incident to the operation of railroads.

The electric railroad has since come into very general use, with its driving engines called motors, and its employés in charge of the engines are called motormen or enginemen. These railroads, notwithstanding, are common carriers of property and persons, the same as steam railroads, and have employés and come into relation with the public in the same way, the only essential difference being that electricity has taken the place of steam as a propelling agency or force, with differently contrived engines, suited to the harnessing of the propelling agency to the use desired, so that the broad purpose of the Legislature applies as completely to the one kind of railroad as to the other. In a narrower sense, a locomotive engine is spoken of as an engine propelled by steam; but when the statute, as the amendment does, extends the provisions of the act to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and to all other locomotives, tenders, cars, and similar vehicles, it broadens the significance so as, without question, to include motors electrically propelled, used upon railroads engaged in interstate commerce. So, also, the original act, with its amend-

ment, includes the operators of such engines, whether called engineers or motormen. We think the statute is broad enough to require that electrically propelled engines and trains engaged in interstate commerce, as well as steam-propelled engines and trains, shall be equipped with air brakes for their efficient operation and control.

The next question may be more clearly resolved by understanding what were the issues presented to the jury for their verdict. The complaint, so far as it is pertinent to the inquiry, alleges:

"(4) That plaintiff on said date aforesaid was directed by the agents, officers, and employés of said defendant to take his said train No. 5, and to proceed from said town of Cœur d'Alene to the city of Spokane, and that plaintiff was given orders, directing him to meet and pass regular train No. 20 at the town of Alan; that when rounding a curve and nearing the station of Gibbs, state of Idaho, which is a point between Cœur d'Alene City, Idaho, and the town of Alan, this plaintiff saw a train coming from the opposite direction and running on the same track upon which said plaintiff's train was running, which said train plaintiff is now informed and believes was Regular Train No. 20.

"(5) That upon the coming into view of said train No. 20, plaintiff used all due diligence to bring his motor upon said train No. 5 to a stop and standstill; that he duly applied the air brakes upon said motor, but, owing to the defective condition of said air brakes, which said condition was wholly unknown to plaintiff, said brakes wholly failed and refused to act, and plaintiff's said train continued to rush forward at a tremendous rate of speed and a collision occurred, plaintiff's said train colliding with said train No. 20, and which said collision caused the injuries hereinafter complained of.

"(6) That said accident and collision was directly due to the wrongful and negligent acts of the plaintiff's said superiors in the giving of said wrongful orders, and in their failure to furnish this plaintiff with a motor and train supplied with proper air brakes in working condition.

"(7) That this plaintiff, after observing said train No. 20 upon the track, had plenty of time to have stopped his said train and prevented said collision if said air brakes had been in good condition and in proper working order."

These allegations were denied, and the defendant for further answer alleges:

"That on said July 31st plaintiff was acting as motorman upon a special train referred to and described in the orders of defendant as motor 5. That under the rules and regulations of such company such special train had no rights over the regular trains operating under the time-table of defendant, and was obliged to keep out of the way of such regular trains; that such special train had no right to go out upon the road when a regular train was due, unless it had telegraphic orders from defendant's train dispatcher in Spokane ordering it to do so; that upon said date plaintiff, in charge as motorman of the special train aforesaid, was standing in defendant's yards at Cœur d'Alene ready to start upon a run to Spokane as soon as there should arrive at Cœur d'Alene one of defendant's regular trains, known on its time-table as No. 20, which was then due; that defendant, knowing that No. 20 was then due, and that he had no right to leave Cœur d'Alene until it had come in, received telegraphic orders from the dispatcher at Spokane to meet another special train at the town of Alan, and that when handing him such orders the conductor of plaintiff's train told him he might run farther down in the yards and wait there until No. 20 came in; that plaintiff started his train under such orders, but instead of stopping at the point in the yards where he had been directed to stop, continued on his way towards Spokane, passing out of the Cœur d'Alene yards and out on the line to Spokane, and at the station of Gibbs, a distance of about 1½ miles from Cœur d'Alene, his train came in collision with No. 20 on a straight track; that No. 20 was in full view of plaintiff's train for a distance of more than 800 feet before the col-

lision occurred, and the motorman of No. 20, seeing plaintiff's train approaching, came to a full stop; that plaintiff could, if he had seen No. 20, have brought his train to a stop within a distance of 150 to 200 feet, and that the collision between the two trains was caused solely and entirely by plaintiff's disobedience of the rules, regulations, and orders of the company, and by his reckless conduct in failing to pay heed to his surroundings, and to keep a lookout upon the track ahead of him so as to observe No. 20 and bring his train to a stop, as he might have done had he have looked ahead of him at all."

The issues thus presented were whether the plaintiff was directed by defendant to proceed with train No. 5, which was special, out of Cœur d'Alene, and to meet regular train No. 20 at the town of Alan; whether the defendant failed to furnish the plaintiff with a motor and train supplied with proper air brakes in working condition; whether plaintiff used due diligence to bring his motor upon train No. 5 to a stop by application of the air brakes upon the motor; and whether, by reason of the defective condition of said air brakes, plaintiff was unable to stop his train in time to prevent collision. And, as presented by the answer, whether, under the rules and regulations of the defendant company in the operation of its train, the plaintiff operating a special was required to keep out of the way of regular trains; whether plaintiff received orders from defendant to meet another special train at Alan, and was directed by the conductor to run farther out in the yards, and there to wait until train No. 20 arrived in; and whether, in disobedience to these orders, he continued on his way, thus bringing on the collision.

[2] A special verdict, where the entire controversy is dependent upon it, should necessarily find all the facts essential to a determination of the issues of the case. In those jurisdictions where both a special and general verdict may be taken, the special verdict will prevail over the general, and this is perhaps the general rule. But this can only be so where the special verdict has been found respecting every material issue; otherwise the court could not be in a position to deduce the conclusions of law necessary to a decision of the case.

[3] It is strongly urged that the federal courts will adopt the local practice with respect to the taking of special and general verdicts and the local rules and procedure for construing the same in determining their potency and effect. It has been distinctly held that the local law with respect to submitting special findings along with a general verdict does not control the federal courts in respect to the mode in which causes shall be submitted to the jury. Indianapolis, etc., R. R. Co. v. Horst, 93 U. S. 291, 23 L. Ed. 898; Mutual Accident Association v. Barry, 131 U. S. 100, 9 Sup. Ct. 755, 33 L. Ed. 60; Toledo, St. L. & W. R. Co. v. Reardon, 159 Fed. 366, 86 C. C. A. 366. This being so, it is a logical consequence that the federal courts will not be bound by the rules obtaining in local courts for interpreting such verdicts. The general rule with respect to this subject is that the court, in determining what judgment shall be entered upon a special verdict, will not look to the evidence nor beyond the pleadings and the judge's record. Mayor, etc., of Borough of Seabright v. New Jersey Cent., 72 N. J. Law, 8, 60 Atl. 64. As said in Daube v. Philadelphia & R. Coal & Iron Co., 77 Fed. 713, 715, 23 C. C. A. 420, 422:

"In determining the force of a special verdict or finding, only the facts found, unmodified by the statements of counsel or by reference to the evidence, can be considered."

The rule covering almost the exact controversy here is very well stated in Conwell v. Tri-City Ry. Co., 135 Iowa, 190, 191 (112 N. W. 546, 547), a code state, as follows:

"On a motion for judgment as against a general verdict based on special findings, every issue raised by the pleadings and not eliminated by the instructions will be presumed to have been found for the party in whose favor the general verdict is returned, and it will be presumed that such findings are supported by sufficient evidence; but the special findings cannot be added to or supported by the evidence, and must be given effect only so far as they necessarily negative the findings which might otherwise be assumed in support of the general verdict."

See, also, Farmers' Sav. Bank v. Forbes, 151 Iowa, 627, 132 N. W. 59; Drake v. Justice Gold Min. Co., 32 Colo. 259, 75 Pac. 912.

[4] With this understanding of the law, we are to determine, without reference to the testimony in the case, whether from the special findings the court is able, as a matter of law, to conclude how the case should be decided, notwithstanding the general verdict. In this relation, we are also to consider the effect of the Employers' Liability Act upon the issues tendered for solution at the trial. This act provides, among other things, that in case of injury or death to an employé, contributing negligence on the part of the employé shall not bar a recovery, but that the damages shall be diminished in proportion to the amount of negligence attributable to such employé, and, further, that no such employé shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of the employés contributed to the injury or death of such employé. 35 Stat. 66. The effect of this statute is to eliminate the element of proximate cause, where concurring acts of the employer and employé contribute as a cause for the injury or death of the employé, especially where the contributing act of the employer was in derogation of a duty imposed under the act for the safety of the employé. This is judicially declared in Grand Trunk Western Ry. Co. v. Lindsay, 201 Fed. 836, 844, 120 C. C. A. 166, 174, where the court said:

"If, under the Employers' Liability Act, plaintiff's negligence, contributing with defendant's negligence to the production of the injury, does not defeat the cause of action, but only lessens the damages, and if the cause of action is established by showing that the injury resulted 'in whole or in part' from defendant's negligence, the statute would be nullified by calling plaintiff's act the proximate cause, and then defeating him, when he could not be defeated by calling his act contributory negligence. For his act was the same act, by whatever name it be called. It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under the act."

To the same effect is Louisville & N. R. Co. v. Wene, 202 Fed. 887, 121 C. C. A. 245.

Now, turning to the special findings, the jury first found that the plaintiff received the train order No. 53. Then they found that the air brakes on plaintiff's train immediately before the collision were in-

sufficient to enable him to control the speed of the train. These findings, construed in the light of the pleadings, show that both the plaintiff and defendant were guilty of negligence, and the acts were concurring, leading to the plaintiff's injury. But this does not relieve the defendant, for, under the liability statute, the defendant acted in derogation of a statute enacted for the safety of the employé. In view of this condition, the holding of the trial court is especially pertinent as follows:

"A collision does not of necessity result from disobedience of orders on the part of an employé, and if the employé who has been guilty of such disobedience is unable to avoid an impending collision because of defective equipment furnished by the master, it surely cannot be said that the defective equipment in no wise contributed to the accident. If it did contribute, a liability exists under the act in question" (the Employers' Liability Act).

The third special finding that the plaintiff's leaving Cœur d'Alene in violation of his orders was the proximate cause of the accident was a mere conclusion of law, and not a finding of fact. The purpose of a special finding is to find the fact, so that the court may deduce the legal conclusions and thus determine the controversy.

Further than this, the jury did not specially find as to all the material issues pertinent to the inquiry under the pleadings.

We think there can be no question that the general verdict should prevail.

[5] As it relates to the motion for a new trial and the action of the trial court respecting the same, it is the established rule in courts of the United States that to grant or refuse a new trial rests in the sound discretion of the court, and the result cannot be made the subject of reversal upon a writ of error. Newcomb v. Wood, 97 U S. 581, 583, 24 L. Ed. 1085; Copper River & N. W. Ry. Co. v Reeder, 211 Fed. 280, 127 C. C. A. 648.

The judgment will be affirmed