### McALISTER, *ADMX.* v. SOUTHERN RWY. CO.

#### (126 S. E., 627)

1. Master and Servant—Negligence as to Engineer Backing Engine Into Freight Train Held for Jury.—In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665) for death of engineer in collision with freight train while backing engine, question whether railroad was negligent in requiring conductor to back engine without sufficient or practicable light on rear, in close proximity to and with headlight of another engine shining on engineer, in permitting the use of the block by numerous trains at the same time, and in failing to provide safe and suitable rules and methods for handling trains, adequate lights, and a safe place and appliances for the engineer, *held* for jury.

2. Master and Servant—Proximate Cause of Death of Engineer Backing Engine Into Freight Train Held for Jury.—In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665) for death of engineer in collision with freight train into which he backed engine, question of whether negligence of railroad in requiring engineer to back engine without sufficient or practicable light on rear, in close proximity to and with headlight of another engine shining on engineer, in permitting use of block by numerous trains at same time, and in failing to provide safe and suitable rules and methods, adequate lights, and safe place and appliances, was proximate cause of engineer's death, *held* for jury.

3. Master and Servant—Contributory Negligence of Engineer Backing Engine Into Freight Train Held for Jury.—In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665) against railroad for death of engineer who backed engine into freight train at night, question of whether engineer was contributorily negligent, *held* for jury.

4. Master and Servant—Assumption of Risk by Engineer Backing Engine Into Freight Train Held for Jury.—In action under Fed-

Note: The question as to what employees are engaged in interstate commerce within the meaning of Federal Employers' Liability Act is discussed in notes in 10 A. L. R., 1184; 14 A. L. R., 732; 24 A. L. R., 634; 29 A. L. R., 1207.

On servant's assumption of risk of dangers imperfectly appreciated, see note in 4 L. R. A. (N. S.), 990.

As to whether servant may assume risk created by master's negligence, see note in 28 L. R. A. (N. S.), 1215.

eral Employers' Liability Act (U. S. Comp. St. §§ 8657-8665) for death of engineer who backed engine into freight train at night, question of whether engineer had assumed the risk, *held* for jury.

5. MASTER AND SERVANT—RISKS OF MASTER'S NEGLIGENCE NOT ASSUMED. —Servant does not assume risks due to master's negligence.

6. MASTER AND SERVANT—MASTER REQUIRED TO FURNISH REASONABLY SAFE PLACE.—It is master's duty to furnish reasonably safe place for work, and if the place is rendered unsafe by an act of a servant charged with such duty it is the fault of the master.

7. MASTER AND SERVANT—TEST OF FELLOW SERVANT IS CHARACTER OF WORK.—Test of fellow servant is not grade of employee but character of work.

8. MASTER AND SERVANT—SUITABLE APPLIANCES, RULES AND METHODS REQUIRED.—It is master's duty to provide and promulgate safe and suitable appliances, rules, and methods and keep them safe and suitable.

9. MASTER AND SERVANT—ASSUMPTION OF RISK BASED ON APPRECIATION OF DANGER.—Assumption of risk is based on knowledge or notice of danger and the appreciation and intelligent understanding of it.

10. MASTER AND SERVANT—CUSTOM OF RAILROAD MAY BE SHOWN.—The custom of a railroad in operating its road may be shown as a basis on which employee had a right to act and rely.

11. MASTER AND SERVANT—EMPLOYEE DOES NOT ASSUME RISK OF EMERGENCY CAUSED BY COSERVANTS IN NEGLIGENT OPERATION OF TRAIN OR IN PROVIDING SAFE PLACE, RULES, AND APPLIANCES.—Employee does not assume risk of emergency brought about by other servants in the negligent operation of a train or in providing safe place, rules, and appliances.

Before DeVore, J., Richland, October, 1923.   Affirmed.

Action by Kate B. McAlister, administratrix of D. G. McAlister, against the Southern Railway Company.  Judgment for plaintiff and defendant appeals.

Herewith is reproduced a sketch of defendant's tracks, to which reference is made in the opinion.

The specifications of negligence as set out in the complaint were as follows:

(a) Failing to keep a proper lookout for and give to intestate sufficient and proper warning and notice of the

SOUTHERN RAILWAY COMPANY
EASTERN DISTRICT    COLUMBIA DIVISION
COLUMBIA,  S. C.
PLAN SHOWING LAYOUT OF TRACKS NORTH OF UNION STATION
TO WHEAT STREET

approach and nearness of the engine in which decedent was riding and the said train, one to the other;

(b) Permitting, authorizing and requiring the engine upon which the intestate was riding to be backed on and along the tracks of said defendant company without a flagman, headlight, lookout or other safeguard or protection, without warning and protecting said intestate;

(c) In not providing the engine on which intestate was riding with any adequate lights on its back or rear for use while so backing;

(d) In not furnishing and providing to, upon and with the freight train, with which said engine collided proper and adequate lights, safeguards and signals;

(e) In directing, ordering and requiring said intestate to move his engine into and upon a busy, unsafe and dangerous track, and while such track was being used by another train;

(f) In permitting, authorizing and requiring the engine upon which intestate was riding to be backed, followed in close proximity by another engine, which cast a strong and powerful headlight on the engine of intestate, thereby blinding him and preventing him from keeping a proper lookout for or discovering the nearness to the other train of defendant, with which the said engine collided, causing his injury and death;

(g) In permitting, authorizing and requiring the use by said intestate of the track and parts of the track of said defendant, constituting a busy line, and so-called block, to be used and occupied by more than one train and more than one engine at the same time in close and dangerous proximity to one another;

(h) In authorizing, permitting and requiring the engine on which intestate was riding to be backed on and along busy and dangerous tracks without proper and adequate safeguards, lights or other precautions and protection;

(i) In failing to adopt and promulgate proper, adequate, and safe rules for the guidance and control of the manner and method of turning trains, and of sending, and moving engines in, on and along the tracks of said defendant company; and in, on and along the tracks within what is termed a block system;

(j) In failing to promulgate and provide proper, safe and suitable rules and regulations to control the use and manner of using a block system of said defendant company, by its engines and trains, and for providing lights, signals, flagmen and protection in and while using said system;

(k) In failing to furnish, provide and keep adequate lights, flagmen and protection for its employees on and along its tracks while used by more than one engine or train in close proximity; and in and near public crossings;

(1) In failing to furnish a safe and suitable place and safe and suitable applicances to its employees, and especially to plaintiff's intestate while engaged in the duties of said defendant company;

*Mr. Frank G. Tompkins,* for appellant, cites: *Servant barred from recovery where he chooses the most dangerous of two ways of doing a given act:* 120 S. C., 473; 86 S. C., 69. *Case tried under the Federal Employer's Liability Act is governed by the U. S. Sup. Ct. decisions:* 241 U. S., 331; 238 U. S., 507. *Duty of Servant:* 68 L. Ed., 1. *Negligence of the Railway Co.:* 240 U. S., 244; 88 Fed. *Assumption of risk:* 233 U. S., 503; 271 Fed., 268; 241 U. S., 228; 241 U. S., 237; 254 U. S. 415.

*Messrs. A. F. Spigner* and *D. W. Robinson,* for respondent, cite: *Contributory negligence:* Fed. Employer's Liability, Richey (2nd Ed.), p. 157; from Sec. 66; 121 S. C., 54; 240 U. S., 69; 60 L. Ed., 1136; 217 Fed., 518; 201 Fed., 836; 113 S. C., 404. *Assumption of risk:* Fed Employer's Liability: ` Richey (2nd Ed.), p. 177, Sec. 72; 58 L. Ed., 524; 64 L. Ed., 433; 66 L. Ed., 482; 123 S. C.,

207; 60 L. Ed., 994. *As to Master's negligence:* 97 S. C., 411; 87 S. C., 213; 28 L. R. A. (N. S.), 1214 and note 1215; 101 S. C., 84; 117 S. C., 124; 118 S. C., 238; 119 S. E., 828; 58 L. Ed., 862; 113 S. C., 139; 205 Fed., 876; 98 S. C., 130; Fed. Employer's Liability, Richey (2nd Ed.), 122-3. *As to knowledge or notice of danger:* 121 S. C., 29; 66 L. Ed., 1078; 58 L. Ed., 1070; Note 28 L. R. A. (N. S.), 122-7; 18 R. C. L., 639; 112 S. C., 543; 120 S. C., 336; 97 S. E., 50. *As to negligence of co-employee:* 66 L. Ed., 481; Fed. Employer's Liability, Richey, p. 186, Sec. 74; 60 L. Ed., 531. *Employee has a right to rely upon the custom in which the company operates its road:* 121 S. C., 62; 98 S. C., 130. *Acts done under the stimulus of sudden peril and effect as to pre-existing knowledge:* 18 R. C. L., 654; 120 S. C., 335; 89 S. E., 1017; 81 S. C., 337; 79 S. E., 935; 81 S. C., 337. *As to protection of property or life:* 18 R. C. L., 655; Sec. 148; 6 A. L. R., 1245-6; 27 L. R. A. (N. S.), 1073; Cheves, 74; 5 A. L. R., 203; Note 19 A. L. R., 5, 8, 9, 10; 112 N. E., 727. *Engineer remaining at post cannot be charged with negligence:* Note, 19 A. L. R., 21, 22.

October 14, 1924.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

"This action was commenced by the service of a summons and complaint on the 10th day of January, 1923, in which the plaintiff, as administratrix of the estate of D. G. Mc-Alister, deceased, alleged that his death had been caused by the negligence, willfulness, and wantonness of the defendant; that both the plaintiff and defendant were engaged in interstate commerce at the time of his death; and that the beneficiaries of the deceased had suffered damages by reason of his death in the sum of $100,000.

"The defendant admitted the formal portions of the complaint and that both the plaintiff and defendant were en-

gaged in interstate commerce, but denied all other allegations of the complaint, and set up further that the plaintiff's intestate died as a result of his own negligence, and that he contributed to any negligence of which the defendant may have been guilty, and that he assumed the risk of the dangers complained of in the complaint, and prayed that the complaint be dismissed.

"The case came on to be tried before Judge J. W. DeVore and a jury at the fall term of the common pleas court for Richland County, 1923, and the jury rendered a verdict for the plaintiff in the sum of $16,920 on the 11th day of October, 1923. Notice of appeal was served on the 22d day of October, from the orders, rulings and judgments rendered or to be rendered herein.

"At the conclusion of the plaintiff's testimony, a motion for a nonsuit was made on grounds hereinafter set out in the record, which motion was refused.

"At the conclusion of all the testimony, a motion was made for a direction of verdict, upon grounds hereinafter set out in the record, which motion was refused also."

The exceptions, five in number, raise practically two questions: First, that the plaintiff's intestate was killed by his sole negligence; second, that, if the railroad company was negligent in any of the particulars set out in the complaint and substantiated by the proof, the dangers, which were complained of, were open, obvious, and well known to plaintiff's intestate, and were assumed by him as a part of his contract of service.

The deceased was one of the oldest engineers in the service of the defendant. No complaint is made by the exceptions as to the law as declared by his Honor in his charge to the jury.

At the request of defendant's counsel the jury were taken down to where the deceased was killed. They examined both by day and at night the surroundings, the light, the curvature, the trains passing. This might have been, and no

doubt was, valuable to the jury, in passing on the vital issues in the case.

It is necessary to carefully examine the evidence in the case without going into special detail. There was sufficient evidence to carry the case to the jury on the question of lookout, warning, and notice from the evidence of Turnipseed, the fireman, of McAlister's engine, when McAlister was killed. Also from that of the witnesses Edwards, and Robb, witnesses introduced by the defendant.

The evidence shows that McAlister on his engine was backing in an easterly direction, and that he was sitting with his body facing the west, but with his head out of the window looking back in the direction his engine was backing. It also shows that another engine was following him, facing him, operated by Engineer Long, and the fireman (on McAlister's engine), Turnipseed, testifies:

"We didn't have anything on our engine to give us a light or to show us the long barrel (freight train), and I first saw it when No. 16 engine showed me the cars by his headlight; that was Mr. Long's engine which was following ours, and its headlight showed me the cars on the freight train. I do not know what part of the train I saw. I saw only the box cars, and didn't see any lights on the freight train."

Long also testified as to the light. Turnipseed gave the signal as soon as it was possible to do so when he saw the other train. He testifies when he gave the signal, "we were right at the cars then, and I jumped."

Martin testified, "I didn't hear the fireman speak but once, he said 'hold.' "

Turnipseed further testified:

"When we got up there where I could see, that is when I saw the cars, I mean to tell the jury I could not have possibly have seen these cars until I got within two or three car lengths."

The evidence shows that the collision occurred immediately after the other train was sighted by Turnipseed and the one warning notice given. Edwards puts it:

"Sitting as Mr. McAlister was, with the levers between his limbs and putting on the brakes, when I hollered I don't know what chance he had to get out. It would be hard to get out I reckon in that position after Turnipseed hollered."

There was ample testimony to go to the jury both from the witnesses of the plaintiff and defendant as to whether the order given to McAlister and his fireman was misleading. The block operator in giving permission to use the block notified McAlister that there was a long barrel (meaning a freight train), ahead, for which they were to look out. Turnipseed testifies that as they went back he was looking out for the long barrel, as the instructions they had received were to look out for the long barrel on the permissive block, and that he was expecting the long barrel to be *behind them*. There was sufficient evidence to carry the case to the jury as to whether or not it was safe to back a train in the nighttime, on a busy track, and whether or not on this particular track they had to back in because they could not head in. There is testimony that, following a custom, just as many trains go into the block towards Blanding street backing as forward. The evidence shows this custom is well established, adopted, and acquiesced in as to the method of handling the engines, and was well known to the company.

As to whether or not it was safe, there is a conflict of testimony. The defendant's witness, Long, an engineer of 35 years' experience, says:

"I wouldn't say it was exactly as safe to go backward at night, as to go forward, but without any light in the back you can at a moderate speed, say four or five miles per hour, back pretty safely. When you are going forward with a headlight, you have the whole road lit up for a good distance ahead, except on curves; whereas, going backward

you have very little light. That little red light gives very little light. On a dark night you haven't much to see by but the stars, moon, or something like that."

Rinehart and Collins say the custom is safe, and other witnesses, Long and Turnipseed, say it is not. Under all the facts and circumstances developed in the evidence, it was the province of the jury to settle it.

There were no lights on the rear (the forward end as it was moving), except a little red light which did not cast any light on the track, according to the evidence, and was only of value to a person in another engine or train who might see the red light. It furnished no light to see with; this is the evidence of witnesses both for plaintiff and defendant. There was some evidence that the operation of an engine backing at night, equipped as this one was, is without safeguard or protection.

Mr. Brand, trainmaster of A. C. L. Railway, a witness of defendant, testifies amongst other things on cross-examination:

"Going at that speed (six or eight miles an hour), with an engine running backwards, you couldn't see anything from the engine cab, but a man on the back of the engine could probably see 40 or 50 feet from him. You are supposed to have a man on the back of the engine in backing up. The rules of safety and prudence require that. In my opinion it is not safe to back an engine on the main line without a man on the back. * * * I wouldn't run without him if I were operating the block. I wouldn't allow a man in the block without some one on the rear. * * * It is up to the superintendent or trainmaster to determine how many men shall be on the engine."

The evidence in this case shows that no one was provided or assigned by the defendant to keep a lookout on the back of the engine. One of the acts of negligence alleged as contributory to the injury was the failure to provide and furnish the freight train with which the engine collided with

proper and adequate lights, safeguards, and signals. The evidence shows that there were 53 cars in the freight train, and that the engine of McAlister struck this freight train at the thirty-fourth car.

The defendant's witness Harris, who was the engineer pushing the freight train from behind, says that there were no lights along that long freight train; his headlight was pushed right up against the caboose and didn't shine out on the track. "I do not know whether there were any flagmen on top of the train or not."

McAlister was ordered by the station master, after McAlister had received and read the block order, to move his engine and back it out of the way for another engine. The station master ordered him to move and back out, and asked him what was the matter that he couldn't get away. McAlister said nothing, but got up on his engine and went on. The station master ordered him to back up out of the way of No. 2, so that it could get there on that track. The evidence shows that he was headed west, and, in order to get to Blanding street, he had to back into Blanding. It was also a question to be submitted to the jury under the evidence the charge of negligence in permitting, authorizing, and requiring many engines and trains to back into and use the block in dangerous proximity to one another, and also the charge as to the effect of the headlight of one engine on the engineer operating another engine. There is evidence that the engine that McAlister was riding in was followed closely by another engine, facing it, and throwing a powerful headlight on it and into the face of McAlister, whenever he turned his head to it.

The evidence shows the lights used on these big engines are very strong, about 200 candle power, and much brighter than an ordinary automobile light. The evidence further shows that it is the custom to issue permissive passes just as fast as they can be written out, and there is no limit to

the number of engines or trains that can be started over that block with proper instructions in the same direction.

On this occasion permissive right was given to a freight train, and a few minutes later to McAlister ,and in a few minutes later to another.

The charge of negligence is made that the defendant failed to adopt, promulgate, and provide suitable rules for the guidance and control of the manner and method of turning trains, and for the use of the block system and the manner of running engines through it. Plaintiff contends that Mc-Alister, obeying the order of the station master and following the custom, was unable to see ahead; that as many trains go into the block towards Blanding street backing as forward, and that McAlister was following the custom known to and acquiesced in by the railroad; that the printed rules introduced govern entirely the operation ofthe block system at Columbia, and "that abrogates all regulations and rules that conflict with it. All trains are under the manager of the block system." He (the manager, Roff) testified: "I let them in and let them out." There was conflict of testimony as to whether it was safe or reasonably safe to operate the trains as was done in this case, and under those rules; a number of defendant's witnesses and employees say that it was safe or reasonably safe. Some, however, say that, while it was the custom, they would rather have it all to themselves. A former superintendent, Collins, says, "The block would be safer, of course, with only one train there at a time." Some of them testify that, if two engines are going around to Blanding street, it would be safer to couple the two engines together, with the one with the headlight in front. A former block operator testified that while he was block operator there had been trouble in there, but not often. The evidence shows that the defendant has never put an additional man on the back end, even at night. The fireman helps, as a rule, and no additional man is assigned to the engines to provide a lookout when they go around to Bland-

ing street.   No flagman or brakeman is put in the rear of tender as a lookout.

Mr. Brand makes along with others the evidence of negligence sufficient to submit to the jury the danger in the system and method used by the defendant.

Moore, the engineer on the freight train carrying 53 cars, was given a clear block on the telephone by the block operator.   The operator knew what Moore was carrying.   The defendant company was charged with this notice.   But McAlister did not know this fact.   It required some time for Moore's train to pass over the switch.   Yet McAlister was given a permissive block one minute later, with the information that the freight train was ahead.

The evidence shows that McAlister in moving his engine was sitting with his head out of the window, turned, and looking back towards the east, while his body faced west. He was also sitting astride his levers, and was in that position when he was found after his death.

There was evidence pro and con as to a safe place and appliances as to switchlights, streets, and surrounding lights and the safety of cab.

There was evidence that the switchlight was essential and necessary for the safe operation of trains over that block, as to what sort of light the switchlight gave, how far it could be seen, and whether or not it was suitable for the purpose it was intended for; the evidence was conflicting, and witnesses differed very widely in their testimony. Whether McAlister saw the light or not is not known. Turnipseed, Martin and Edwards, who were in the engine with him, did not.   Engineer Harris, who was pushing the freight car, did not.    Bouknight said where he was, he could see the switchlight; that he does not remember seeing it; that he does not remember seeing it at all that night; that he does not remember anything at all about the switchlight that night, although he and the engineer, who was following McAlister, got to the scene of the accident at the same time.

There is evidence that a number of times the light was not burning, and reports had been made that the same switchlight was not burning. When the jury went there it was not burning.

Hall saw the crowd there and the light not burning, and went and told Cowly, whose duty it was under the supervision of Smith, and further up of Fowlkes, to light this light, and he went and lit it.

Fowlkes, the defendant's roadmaster, testifies:

"If it was not necessary for a switchlight to be there, it would not be there, but so far as safe operating, we operate every day with lights out."

As to the surrounding lights, the evidence was conflicting; the same as to the place, whether safe or unsafe; the same as to appliances, whether a wooden car was safe, or reasonably safe or unsafe; and as to whether defendant company should have supplied steel cars as being much safer. It was properly left to the jury to determine whether McAlister used such prudence and care as was necessary under all of the facts and circumstances of the case, and the position he found himself in. It was for them to determine whether he was a capable engineer, with 30 years' experience, 4 as a fireman, and 26 as an engineer; as to whether or not he, by his carelessness and negligence, was the sole cause of his injury, and in any manner by his negligence contributed thereto; whether he did what he ought to have done or left undone anything that he ought to have done. His actions were for the jury, under all of the facts and circumstances of the case.

The evidence shows that he died at his post of duty. And from the evidence it can be inferred that his action might have saved the lives of Turnipseed and Edwards.

We do not agree with the defendant as contended by 1, 3 the exceptions that the defendant was guilty of no negligence, and that the injury and death of McAlister was due to his own negligence, and that this is the

31—S. C. R., 130

only reasonable inference to be drawn from the facts. It was properly left to the jury for their determination whether the defendant's negligence was the proximate cause of the death of the plaintiff's intestate, whether it was the sole proximate cause of his injury, whether it contributed in whole or in part to the injury, and whether the negligence of McAlister was the sole cause of his injury or contributed in any manner to his injury.

His Honor was clearly right in refusing the motion for a nonsuit as asked for by the defendant, as there was ample testimony to submit the case to the jury for their determination.

There is no complaint as to his Honor's charge to the jury. The exceptions complain that he did not grant a nonsuit or directed verdict as asked for by the defendant.

"The common-law principle controlling the right to recover, that is, that in the negligent act of the defendant must be found the proximate cause of the injury, is abrogated in cases coming within the statutes, and liability is made to depend upon the question whether such negligent act contributed 'in whole or in part' to the injury. That is, if the cause of action is established by showing that the injury resulted in whole or in part from the defendant railway company's negligence, the statute cannot be nullified and the right of recovery defeated by calling the plaintiff's act the proximate cause of the injury; that the plaintiff's negligent act or omission, by whatever name it may be called, is the same act or omission, and that it is only when such act or omission on the part of the plaintiff is the sole cause—when the defendant's act is no part of the causation—that the defendant is free from liability under the act." Fed. Employers' Liability, Richey (2d Ed.), p. 157, from section 66. *Thornhill v. Davis,* 121 S. C., 54; 113 S. E., 370 (I), 24 A. L. R., 617. *Ill. Cent. Ry. v. Skaggs,* 240 U. S., 69; 70; 36 S. Ct., 249; 60 L. Ed., 531. *Spokane & I. E. R. Co. v. Campbell,* 241 U. S., 510; 36 S. Ct., 683; 60 L. Ed., 1136.

*Spokane & I. E. R. Co. v. Campbell,* 217 F., 518; 133 C. C. A., 376 (9th C. C. A.). *Grand Trunk W. Ry. Co. v. Lindsay,* 201 F., 836; 120 C. C. A., 166 (7th C. C. A.)

In the *Skaggs Case,* the Supreme Court, speaking through Mr. Justice Hughes, now Secretary of State, says:

"It is contended that the State Court erred in permitting a recovery under the federal statute for the reason that the injury resulted from Skagg's own act, or from an act in which he participated. The company, it is said, 'cannot be negligent to an employee whose failure of duty and neglect produced the dangerous condition.' It may be taken for granted that the statute does not contemplate a recovery by an employee for the consequences of action exclusively his own; that is, where his injury does not result in whole or in part from the negligence of any of the officers, agents, or employees of the employing carrier, or by reason of any defect or insufficiency, due to its negligence, in its property or equipment. 35 Stat. at L., 65; chapter 149, Comp. Stat., 1913, § 8657. But, on the other hand, it cannot be said that there can be no recovery simply because the injured employee participated in the act which caused the injury. The inquiry must be whether there is neglect on the part of the employing carrier, and, if the injury to one employee resulted 'in whole or in part' from the negligence of any of its other employees, it is liable under the express terms of the act. That is, the statute abolished the fellow-servant rule. If the injury was due to the neglect of a co-employee in the performance of his duty, that neglect must be attributed to the employer, and, if the injured employee was himself guilty of negligence contributing to the injury, the statute expressly provides that it 'shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.' "

And in the *Lindsay Case* above, after careful consideration on a rehearing, the Court announced the following doctrine:

"If, under the Employers' Liability Act, plaintiff's negligence, contributing with defendant's negligence to the production of the injury, does not defeat the cause of action, but only lessens the damages, and if the cause of action is established by showing that the injury resulted 'in whole or in part' from defendant's negligence, the statute would be nullified by calling plaintiff's act the proximate cause, and then defeating him, when he could not be defeated by calling his act contributory negligence. For his act was the same act by whatever name it be called. It is only when plaintiff's act is the sole cause—when defendant's act is no part of the causation—that defendant is free from liability under the act."

This principle is cited with approval by the United States Supreme Court in the *Spokane Case* above.

"The fellow-servant doctrine has no application to a case arising under the Federal Employer's Liability Act. * * * Nor is the defense of contributory negligence available, except in mitigation of damages." *McDowell v. Sou. Ry. Co.,* 113 S. C., 404; 102 S. E., 640 (3 and 4).

There is abundant evidence in the case for submission to the jury as to whether or not the defendant company was guilty of negligence in the particulars charged against it, as being negligent in the custom and method of backing engines without any sufficient or practicable light on the rear, in close proximity to and with the headlight of another engine shining on the engineer, in permitting the use of the block by numerous trains at the same time, in failing to provide safe and suitable rules and methods for handling the trains and in failing to provide adequate lights and a safe place and appliances for the deceased, McAlister.

The other exceptions complain of error on the part of his Honor in not granting a nonsuit or directed verdict, in that the risk and danger attending the movement of the engine and causing the death of McAlister were assumed by him.

"An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear, not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it." Federal Employers' Liability, Richey (2d Ed.) p. 177, § 72, *Gila Valley, etc., R. Co. v. Hall,* 232 U. S., 101; 34 S. Ct., 229; 58 L. Ed., 524. *Chicago, R. I. & P. R. Co. v. Ward,* 252 U. S., 21, 22; 40 S. Ct., 275; 64 L. Ed., 433, 434. *Reed v. Director General,* 258 U. S., 95; 42 S. Ct., 191; 66 L. Ed., 482. *Kell v. Rock Hill Fertilizer Co.,* 123 S. C., 207; 116 S. E., 100.

The quotation above is from the *Hall Case* above, quoted in Richey's Federal Employers' Liability.

In the *Ward Case* above, the Supreme Court says:

"As to the nature of the risk assumed by an employee in actions brought under the Employers' Liability Act, we took occasion to say in *Chesapeake & O. R. Co. v. De Atley,* 241 U. S., 310, 315; 60 L. Ed., 1016, 1020; 36 Sup. Ct. Rep., 564: 'According to our decisions, the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume

that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them.' The Federal Employers' Liability Act places a coemployee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risk.   * * *

"For the lack of proper care on the part of the representative of the railway company while Ward was in the performance of his duty, he was suddenly precipitated from the front end of the car by the abrupt checking resulting from the failure to make the disconnection. This situation did not make the doctrine of assumed risk a defense to an action for damages because of the negligent manner of operation which resulted in Ward's injury, and the part of the charge complained of, though inaccurate, could have worked no harm to the petitioners. It was a sudden emergency, brought about by the negligent operation of that particular cut of cars, and not a condition of danger, resulting from the master's or his representatives' negligence, so obvious that an ordinarily prudent person in the situation in which Ward was placed had opportunity to know and appreciate it, and thereby assume the risk.'

The servant does not assume the risks due to the master's negligence, and it is the duty of the master to furnish a reasonably safe place to work, and, if the place is rendered unsafe by an act of a servant charged with this duty of the master, it is the fault of the master. *Stanton v. Chem. Corp.*, 97 S. C., 411; 81 S. E., 660. *Lewis v. Bldg. Co.*, 87 S. C., 213; 69 S. E., 212. *Scheurer v. Banner Rubber Co.*, 227 Mo., 347; 126 S. W., 1037; 21 Ann. Cas., 1110; 28 L. R. A. (N. S.), 1214, and note at page 1215, etc. *Grainger v. Ry.*, 101 S. C., 84; 85 S. E., 231. *Leopard v. Beaver Duck Mills*, 117 S. C., 124; 108 S. E., 190. *Kin-*

*sey v. Colleton Cypress Co.,* 118 S. C., 238; 110 S. E., 395.
The test of fellow servant is not the grade of employee but the character of the work. Was it the performance of some duty the master owed to the injured servant? *Leopard v. Duck Mills,* 117 S. C., 124; 108 S. E., 190. *Kell v. Rock Hill Fertilizer Co.,* 123 S. C., 207; 116 S. E., 99. In the *Kell Case* the Court says:

"If the injury was caused by any breach of a nondelegable duty of the master, the danger of such injury was not a risk assumed by the servant, unless it appears to the exclusion of any other reasonable inference that the servant continued in the service and undertook to perform this work in hand, with full knowledge of the condition brought about by the master's negligence, and with some intelligent appreciation of the danger. The latter conclusion involves the element of such intelligent choice on the servant's part as will support a contractual obligation, and rests upon the proposition that where a servant, whose original contract did not embrace the assumption of a certain risk, nevertheless chooses to remain in the service of the master with full knowledge of that risk and comprehension of the danger to which he is thereby exposed, without a promise on the master's part to remedy the defect, etc., he will be held to have impliedly contracted to assume such additional risk of injury. *Berry v. Dillon Mills,* 120 S. C., 333; 113 S. E., 348. *Barnhill v. Cherokee Falls Mfg. Co.,* 112 S. C., 541; 100 S. E., 151."

"If an injury is shown to have resulted from an unsafe place to work, a *prima facie* case of negligence is made out against the master, and the burden of exculpating himself is cast upon him."

It is likewise the duty of the master to provide and promulgate safe and suitable appliances, rules, and methods, and keep them safe and suitable. *Bunch et al. v. American Cigar Co.,* 126 S. C., 324; 119 S. E., 828.

*Rikard v. Middleburg Mills,* 113 S. C., 139; 101 S. E., 643. *McDowell v. Southern Railway,* 113 S. C., 404; 102 S. E., 639. *Sturdyvin v. Railway Co.,* 98 S. C., 130; 82 S. E., 275. *Kell v. Rock Hill, supra.*

In the *Kell Case* the Court says:

"An employer engaged in construction work who furnishes a detailed plan, reasonably safe and suitable material, tools, and appliances, and an adequate force of men for the work as a whole, and then hires a competent manager and foreman, may not thereafter wash his hands of all responsibility for an injury sustained by a laborer in the progress of the work. The duty of supervision extends to the prevention of such injuries from the carelessness of fellow employees in executing details as might be reasonably anticipated and provided against by proper organization and executive planning, and by the adoption of proper methods, rules and regulations for carrying on the work, considered with due regard to its nature and scope. We think the evidence here is fairly susceptible of the inference that the moving of the heavy gin pole hoisting apparatus from place to place was a regular operation, and was not such a transitory detail of the work as was beyond the pale of the master's duty of supervision."

Mr. Richey, in his work on Federal Employer's Liability, pages 122, 123, says:

"Under the clause providing that the railroad shall be liable for 'the negligence of any of its officers, agents, or employees,' negligence can be based upon its failure to make and promulgate rules, when by so doing they would have prevented an injury."

Assumption of risk is based on knowledge or notice of danger and the appreciation and intelligent understanding of it. *Williams v. C. & W. C. Railway Co.,* 121 S. C., 29; 113 S. E., 300. *S. A. L. Railway Co. v.*

*Horton,* 233 U. S., 504; 34 S. Ct., 635; 58 L. Ed., 1062; L. R. A., 1915C, 1; Ann. Cas. 1915B, 475.

In the *Horton Case* the Court says:

"But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recognized and applied in numerous decisions of this Court."

Mr. Justice Hydrick says in *Barnhill v. Cherokee Falls Manufacturing Co.,* 112 S. C., 543; 100 S. E., 152:

"Nonappreciation of the danger is inconsistent with the supposition that, in entering upon or remaining in the service, the servant exercised that deliberate choice which is an essential element of contract, upon the implication of which the doctrine rests. When we say that a man appreciates a danger, we mean that he forms a judgment as to the future, and that his judgment was right, * * * and if he [the master] would relieve himself of the consequences, on the ground that the servant assumed the risk, he must show, not only that the servant knew the danger, or that it was so obvious that he should have known it, but also that he comprehended or appreciated it."

This doctrine is reaffirmed by this Court in *Berry v. Dillon Mills,* 120 S. C., 336; 113 S. E., 348.

Our sister State, North Carolina, in *Jones v. Railway Co.,* 176 N. C., 265; 97 S. E., 50, uses this language:

· "This doctrine of assumption of risk is based upon knowledge or a fair and reasonable opportunity to know, and usually this knowledge and opportunity must 'come in

time to be of use.' 26 Cyc., p. 1202, citing *Wright v. Chicago, I. & L. Railway Co.,* 160 Ind., 583; 66 N. E., 454. This principle is very generally approved in the cases and textbooks on the subject, and in authoritative Federal decisions construing the Act in question, in reference to the negligence of fellow servants and the incidental assumption of risks, it has been held that the effect of this first section is to place the conduct of fellow servants on the same plane as the employer himself in such cases, and it is fully recognized that an employee does not assume the risks of his employer's negligence unless, as stated, he is given fair opportunity to know and appreciate the risks to which he is thereby subjected."

The acts and neglect of a coemployee are in the same class under the statute as that of the employer, and the party injured does not assume liability for neglect of a coemployee.

In *Reed v. Director General,* 258 U. S., 95; 42 S. Ct., 191; 66 L. Ed., 481, the Court says:

"The second Employers' Liability cases (*Mondou v. New York N. H. & H. R. Co.,* 223 U. S., 1, 49; 56 L. Ed., 327, 345; 38 L. R. A. [N. S.], 44; 32 Sup. Ct. Rep., 169; 1 N. C. C. A., 875), declared that: 'The rule that the negligence of one employee, resulting in injury to another, was not to be attributed to their common employer is displaced by a rule imposing upon the employer responsibility for such an injury, as was done at common law when the injured person was not an employee.' "

And in *Chicago, R. I. & P. R. Co. v. Ward,* 252 U. S., 18; 40 S. Ct., 275; 64 L. Ed., 430, we said:

"The Federal Employers' Liability Act places a coemployee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risk."

The custom of the company in operating its road may be shown as a basis upon which the employee had a right to act and rely, and this Court has said in

*Thornhill v. Davis, Director General,* 121 S. C., 62; 113 S. E., 374; 24 A. L. R., 617:

"The other exceptions relate to testimony being admitted tending to establish the customary method on the part of the railway in operating its trains under conditions similar to those existing at the time this accident happened, and the failure of the company to supply fuses for use under like circumstances. Testimony of custom is relevant when it tends to show upon what course of conduct on the part of the principal the servant may rely in carrying on the work of the principal. It has been so held repeatedly by this Court."

In *Sturdyvin v. Railway Co.,* 98 S. C., 130; 82 S. E., 277, this Court says:

"The measure of the duty also depends somewhat upon the manner in which the service is customarily performed, with the knowledge and acquiescence of the master. The master's duty does not end with the adoption of a proper system and the making and promulgation of suitable rules for the safety of his servants. He is bound also to exercise reasonable care and diligence to see that the rules are enforced, and that the instrumentalities furnished are properly used. 3 Labatt. M. & S. (2d Ed.), §§ 1110, 1120."

Employee does not assume the risk of emergency brought about by other servants in the negligent operation of a train or in providing safe place, rules and appliances. *L. & N. R. Co. v. Stewart,* 241 U. S., 264; 36 S. Ct., 586; 60 L. Ed., 994.

As to what McAlister did, situated as he was, whether negligent or whether he assumed the risk, was for the jury to determine. In *Berry v. Dillon Mills,* 120 S. C., 335; 113 S. E., 349, Mr. Justice Marion, speaking for the Court, says:

"In thus meeting an emergency not brought about by his own negligence, the law required of him only the care

which a man of ordinary prudence would have exercised in the same circumstances, 'and makes proper allowance for excitement, terror, or the instinct of self-preservation.' "

Justice Woods, in *Thompson v. Railway,* 81 S. C., 337; 62 S. E., 398; 20 L. R. A. (N. S.), 426, lays down the rule, saying:

"He was absorbed in the effort to stop the train, and, no doubt, excited to the degree of consternation by the emergency. He was facing a powerful electric headlight which, it is reasonable to suppose, blinded him to the extent that he erred in his estimate of the distance of the train from him until it was too late to escape. The rule was established in this State in 1840, by the case of *Ivy v. Wilson,* Cheves, 74, that it is not contributory negligence *per se* for one who owes the duty to protect property to take a manifest risk to save it, unless the risk was wanton and unreasonable, and that the exposure by a person so situated is not to be presumed to be wanton or unreasonable exposure to unnecessary danger."

The jury were the judges as to McAlister's conduct, whether there was an emergency, whether he was attempting to protect the property of his employer and protecting the life of himself and others. The authorities are numerous that under such circumstances the Courts are more liberal in construing the conduct of one acting in an emergency. *Norris v. A. C. L. R. Co.,* 152 N. C., 505; 67 S. E., 1017; 27 L. R. A. (N. S.), 1069. Mr. Justice Hoke says:

"This being true, it is well established that, when the life of a human being is suddenly subjected to imminent peril through another's negligence, either a comrade or a bystander may attempt to save it, and his conduct is not subjected to the same exacting rules which obtain under ordinary conditions; nor should contributory negligence on the

part of the imperiled person be allowed as a rule to affect the question. * * *

"So one who, seeing his property imperiled, hastens to protect it, and in doing so imperils his own person, is not necessarily deprived of remedy thereby."

*Waters v. Taylor,* Court of Appeals of New York, 218 N. Y., 248; 112 N. E., 727; L. R. A. 1917A, p. 348:

"The law does not require engineers in charge of trains to leave their post when danger is threatened in order to save themselves, and they cannot be charged with negligence in remaining as long as there is hope, however faint, of averting disaster to others."

Note and cases 19 A. L. R., 21, and following. Further from the same note, quoting from an Indiana case at page 22:

"* * * That if he believes his duty requires him to do what he can to save those under his charge, and he braves death in the discharge of that duty, the law has for him no censure, but has, on the contrary, high commendation and respect; and that it was no evidence of negligence that the engineer in this case did not leap, as did the fireman, but, instead of deserting his post, went to his death in discharge of a duty which his position cast upon him."

There is ample evidence in this case to sustain the verdict of the jury. We see no error as complained of. Chief Justice Gary, in *Renno v. Seaboard Air Line Railway,* 120 S. C., 18; 112 S. E., 443, has well said:

"We deem this an opportune time to call attention to the fact that the jury of 12 men, in a common-law case, for which the Constitution provides, has been regarded from time immemorial as better qualified to pass upon the facts of the case than even the [presiding] Judge"; and that he, "by reason of the fact that he heard the witnesses testify, and could judge of their credibility, had a better opportunity than the members of this Court to determine the proper

inferences to be drawn from the testimony. Furthermore, as the jury and the Circuit Judge have found that there was such testimony, there is a presumption in this Court that the trial in the Circuit Court was free from error. Therefore, the plaintiff occupies a more favorable position than he did in the Circuit Court, when the burden of proof rested upon him."

All exceptions are overruled and judgment affirmed.

Mr. Justice Fraser concurs.

Mr. Justice Marion concurs in result.

Mr. Justice Cothran dissents.

Mr. Chief Justice Gary did not participate.

Mr. Justice Cothran (dissenting): I sincerely regret the necessity of dissenting with the opinion of Mr. Justice Watts in this case for more reasons than one. The deceased was a deservedly popular man, an engineer of long and faithful service; his distressed family will find small compensation for their loss in the verdict which has been rendered; but a decision of the case according to the law, which both parties are entitled to, outweighs the sentiment of benevolence.

The situation cannot be clearly comprehended without a reproduction of the sketch attached to the record for appeal, which should be incorporated, in reduced form, with the report of the case.

The main line of the Southern Railway between Columbia and Charlotte leaves the Union Station and passes eastward by the Blanding Street Shops also in Columbia, at a distance of approximately two miles; the main line from Columbia to Charleston also leaves the Union Station and by a right curve, approximately southeastwardly, passes by the Andrews yard, at a distance of a mile or two; at a point some 200 or 300 yards from the Union Station on the Charleston road, a track is laid, called the Andrews cut-off, which connects the Charleston road with the Charlotte road

at a point about halfway between the Union Station and the Blanding Street shops.

The situation, therefore, is triangular in shape; the apex, pointing towards Charlotte, at the intersection of the Andrews cut-off and the Charlotte road; the northern side reaching from the apex to the Union Station; the southern side reaching from the apex to the Charleston road; and the base, that portion of the Charleston road from the Union Station to the point where the Andrews cut-off leaves the Charleston road.

About 10:30 p. m. on January 10, 1923, McAlister brought his train, No. 20, from Augusta to Columbia, and in order to reach the landing most convenient to passengers it became necessary, as was customary, to enter a Y track west of the station and back the train under the shed; his engine was then headed west; he was required after completing his run to detach his engine from the train and upon another track run it around to the Blanding Street shops, where it was to be stabled; it was customary for the engineer to exercise his option in running the engine backward on these trips or to reverse it on the Y and run it forward; both methods were in use by the engineers.

On this occasion McAlister chose to run it backward.

The operations of engines and trains between the Union Station and the Blanding Street shops, 2 miles, and between Blanding Street shops and Andrews yard are controlled by a block system. Between 225 and 275 trains and engines daily pass through the block. *Under the rules they were allowed to pass through in only one direction at the same time.* It is manifest that, if only one engine or train was allowed within the block at a time, great delay and congestion would ensue, hence it was provided that the first engine or train let into the block, going east or west, would be given a *clear card* by the block operator, which meant that no other engine or train was at that time within

the block, and that no other going in the *opposite direction* would be permitted to interfere with its movement. It would result in an unnecessary waste of time to hold the· next engine or train desiring to enter the block until the first had gone through, and, therefore, the succeeding engine or train would be given a *permissive card*, which meant that another engine or train, or perhaps a dozen or more, were already in the block, and that the receiver of the *permissive card* must proceed with caution; that is, he must have his engine under such control as would enable him to stop within half the distance that he could see, in the direction in which he may be moving. These cards, clear or permissive, were issued by the block operator, whose office was at the Union Station.

At the apex of the triangle, the point of intersection of the Andrews cut-off with the Charlotte main line, the connection, of course, was effected by a switch, the shifting of which from one track to the other, automatically operated a signal light at the top of what is called the switch target, a tripod of steel about 12 feet high, on the north side of the Charlotte main line. The light was within a square receptacle, equipped with four glass "Bull's eyes," two of which were clear and the others red. When the switch was set so that trains could use the main line, by the mechanical construction of the switch and connecting rods, the clear bull's eyes were in a line parallel with the main line, as it is said, the target showed "white", indicating that the main line connection was clear; when it was set so that trains could use the "cut-off," the red bull's eyes were in a line parallel with the main line, indicating that the main line connection was not clear.

While McAlister was within the shed at the Union Station, a freight train with 53 cars, coming from Charleston, passed the Andrews yard and entered the "cut-off," bound in the direction of Charlotte; it was being drawn by its own

engine and pushed by a switch engine; as it approached the apex, the intersection with the Charlotte main line, it stopped for block orders and was given a *clear* card to the Blanding Street shops, at 10:37 p. m., which as stated, indicated that nothing was going either way between the apex and the shops.

After detaching his engine from the passenger coaches, McAlister, running backward, stopped opposite the block office, and his fireman went for the block card, clear or permissive, as the occasion required.  He was given a *permissive* card, at 10:38 p. m., a minute later than the time at which the freight train had been given a *clear* card which, as stated, indicated that there was at least one train at that time within the block and moving in the direction of the shops.  The block operator, in addition to giving the fireman, Edwards, the permissive card, which of itself indicated the presence of another train within the block, told him "to look out for a 'long barrel' ahead."  (A "long barrel," it appears, in railroad parlance means a long freight train.)  The permissive order was given to McAlister, who read it aloud in the presence of the fireman, as required, and the verbal message, "look out for a long barrel ahead," was delivered to him by the fireman, who received it from the operator.

There was some little delay in McAlister moving off after receiving the order and verbal message, and the trainmaster spoke to him about it, saying that he wanted that track for No. 11, another train coming from Charleston. McAlister mounted his engine and proceeded at about six miles an hour; the engine moving backward, and he leaning out of the window with his face toward Charlotte and his body in the opposite direction.

In the meantime, the block operator had given to another engine, driven by one Long a permissive order also of the same purport to go to the shops.  This engine was being

32—S. C. R., 130

run forward about 100 yards behind McAlister, with a strong headlight.

Three other men were riding on McAlister's engine; his fireman, Turnipseed, and Edwards and Martin, two trainmen, riding for their own convenience.

As McAlister's engine approached the "apex" within about two or three car lengths of it, the headlight from Long's engine, the one following McAlister, disclosed to the fireman, Turnipseed, the freight train passing through the switch from the "cut-off" to the main line; Turnipseed yelled to McAlister, "Hold it," but it was too late; McAlister's engine crashed into the thirty-fourth car, was overturned, and he was scalded to death; his companions escaped by jumping from the engine; two of them passing through McAlister's window between him and the boiler head.

The plaintiff bases her demand that the railway company shall compensate her for the death of McAlister, upon the ground that it was to blame for his death. She does not and cannot claim, and simple justice does not allow. such demand, unless this vital element shall appear from the evidence.

The specifications of blame, negligence as the law terms it, are numerous and are detailed with minute circumstantiality. They are set forth in the complaint, and need not be repeated here; the reporter will incorporate them in the report of the case; they may be fairly condensed into the following, as indicated in the argument of counsel for the respondent: (1) Absence of lookout, warning, and notice; (2) running the engine backwards over a busy track; (3) absence of lights on the rear end of McAlister's engine, which was in front as he was going; (4) absence of lights on the freight train with which McAlister collided; (5) requiring McAlister to enter the block while the track was being used by another train, in view of the business

done on said track and its consequent dangerous, unsafe situation; (6) requiring McAlister to run his engine backward, in view of the fact that it was to be closely followed by another engine, equipped with a strong headlight, calculated to blind him and prevent him from keeping a proper lookout for the freight train with which he collided; (7) failure to adopt and promulgate proper, adequate and safe rules for the operation of the railway company's block system; (8) absence of a light upon the switch target at the particular time; (9) the presence of a deep cut through which the freight train passed approaching the switch; (10) equipping the cab of McAlister's engine with a wooden cab instead of a steel one.

At the appropriate stages of the trial the defendant made motions for a nonsuit and a directed verdict upon the grounds: (1) That there was no evidence tending to show any actionable negligence as alleged on the part of the defendant; (2) that the evidence conclusively showed that the injury sustained by the intestate was the result of his sole negligence; (3) that the evidence showed conclusively that the injury sustained by the intestate was the result of the risks of his employment which he had assumed.

The motions were refused. The exceptions raise the same questions as those upon the motions for nonsuit and a directed verdict.

I may pass by a minute discussion of the defendant's contention that there was error in refusing the motions upon the grounds that there was no evidence tending to show negligence on the part of the defendant, and that the evidence showed that the collision was caused solely by the negligence of McAlister. As to some of the specifications of negligence, in fact as to a large majority of them, there was evidence tending to show want of due care on the part of the defendant; there was no error, therefore, in overruling the motions on these grounds; but I am convinced

that a consideration of each specification will show that it is either not shown to have been an act of negligence, or, if so, clearly a risk assumed by the engineer.

Something is said in the leading opinion and in the argument of counsel for the respondent, in reference to the contributory negligence of the intestate; but that matter is not entitled to consideration, and is not discussed by the counsel for the appellant, for the reason that, if there is any evidence of negligence on the part of the railway company, the contributory negligence of the injured servant, under the Federal Employer's Liability Act can only be considered in diminution of damages, not as a complete defense. It, therefore, is not to be considered upon either of the motions referred to, under the assumption with which I am proceeding that there was some evidence tending to establish negligence on the part of the defendant.

Under said Act, however, the defense, as at common law, of assumption of risk, is open to the employer. For that reason I do not deem it necessary to consider any other question, being convinced by a most painstaking consideration of the evidence that no other reasonable inference can be drawn than that that defense should have prevailed upon either of said motions.

It does not appear to be fully appreciated that assumption of risk arises under two very distinct conditions: (1) Where the master has been guilty of no negligence at all, but where the servant has been subjected to the normal dangers of his employment, as, for example, a brakeman up on top of the cars, subjected to the leaning cars rounding a curve; (2) when the master has been guilty of negligence in the matter of defective instrumentalities or places of work, the servant being cognizant of the defect and appreciating its danger. In the one case the master has been negligent, in the other, not, and yet in both cases the servant will be held to have assumed the risk.

The distinction is clearly indicated in *Seaboard Air Line R. Co. v. Horton,* 233 U. S., 504; 34 S. Ct., 640; 58 L. Ed., 1062; L. R. A. 1915C, 1, Ann. Cas. 1915B, 475:

. "Such damages as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages.  And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not.  But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work.  These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them."

The same principles are announced in the cases of *Kell v. Rock Hill Company,* 123 S. C., 199; 116 S. E., 97.  *Berry v. Dillon Mills,* 120 S. C., 333; 113 S. E., 348.  *Barnhill v. Cherokee Falls Manufacturing Co.,* 112 S. C., 541; 100 S. E., 151; and many prior decisions of this Court.

In the *Horton Case* the engineer was injured by the explosion of a water gauge, the injurious consequences of which became effective by reason of the absence of a guard glass, which customarily inclosed the gauge and protected the engineer from flying portions of the glass of the water gauge in case of an explosion.  The engineer was fully aware of the absence of the glass and the danger.  The Court said:

"When the employee does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that

the defect will be remedied, the employee assumes the risk, even though it arise out or the master's breach of duty."

In *Bengtson v. C., Sa. P., M. & O. R. Co.,* 47 Minn., 486; 50 N. W., 531, it is said:

"While it is the duty of a master towards his servant to use proper care to conduct his business in a safe manner, yet, if his mode of doing the business is such as to subject the servant to risk of injury, the latter, by continuing in the employment with knowledge of the dangers, takes upon himself the risk."

In *Fordyce v. Lowman,* 57 Ark., 160; 20 S. W., 1090, it is said:

"If he knew when he entered the service of the defendants that it was the custom on the road to push flat cars ahead of the engine, he is deemed to have contracted with reference to the custom, and to have waived any claim for damages for injury resulting from so pushing the cars, though thus pushing them was improper."

In *Caron v. B. & A. R. Co.,* 164 Mass., 523; 42 N. E., 112, it is said:

"The law is well settled that under such circumstances the servant assumes the risk of such dangers as ordinarily are connected with the service in which he is engaged. He enters the business as it is, and cannot be heard to complain that it might have been made safer, or that it was conducted in a hazardous manner."

Tested by this rule, every specification of negligence, of which there is any evidence, comes within the rule of assumption of risk, in that its existence was known to, and its danger appreciated by, the engineer.

1. *Absence of lookout, warning, and notice.* If, as I have assumed, there was negligence on the part of the railroad company, who could have better known this and appreciated the danger than McAlister?

2. *Running the engine backward.* The same must be said of this.

3. *Absence of lights.* The same. .

4. *Absence of light on the freight train.* The freight train had a headlight to the forward engine and also to the switch engine pushing it; there is nothing to show that it was the duty of the railroad company to string lights along such train, and, if there had been, the omission was obliged to have been known by McAlister.

5. *Requiring McAlister to enter the block under the circumstances.* It is shown to have been the custom ever since he began engineering to put more than one train in the block at a time, a custom he is obliged to have known, and if dangerous no one could have better known it than he.

6. It is here claimed that McAlister should not have been required to enter the block in view of the fact that another engine was to follow, which was equipped with a strong headlight, which, as McAlister was running his engine backward, so blinded him that he could not see obstacles ahead of him.

The evidence showed that the following engine was at least 100 yards behind McAlister; that he was sitting at the throttle with his body in a normal position, but with his head out of the cab window and his face turned *away from the headlight,* which was a help rather than a hindrance to him. Moreover, if this arrangement was fraught with peril to him, which I do not concede, he was fully aware of it, and certainly was in a better position to discover and appreciate it than the Court. The engineer of that engine gives very pertinent testimony: "My light could not have blinded him as much as his blinded me. My light ought to have helped him." He further testified that when he was on the trestle more than 200 yards from the switch he saw by the aid of his own headlight, the freight train standing

on the cut-off track.   If he saw it why could McAlister not have seen it?

7. It is contended that the rules and regulations by which the block system was operated were not proper, safe, and suitable.   Assume that the defendant was negligent in this respect, McAlister had been an engineer and fireman for 30 years, 26 of which as an engineer and many years operating at this very spot and under these very rules.   That he was aware of the methods of work, the rules, and regulations, goes without saying; if this Court can say that such operation was fraught with danger, can it be assumed that he did not as fully appreciate it?   There is evidence to the effect that McAlister had been making the Augusta run for six years, almost daily; that he ran over the block sometimes as many as four trips a day; and that the rules of the block system had been in force for more than 30 years.

8. Although no such delict is specifically charged in the complaint, counsel argue, under the general allegation of an unsafe place and unsafe appliances, that the light upon the switch target was not burning at the time of the collision.

There is the faintest evidence, if any at all, to sustain this contention of fact.   The plaintiff's witness, Turnipseed, testified, "I did not see the light"; that after the accident he did not notice that it was burning.   The witness, Martin, testified, "I didn't see any light.   I didn't notice it." Edwards testified that he could not see the light from where he was on the engine; "I did not look at the switchlight that night."   Bouknight testified that after the accident he did not look at the light; "I don't remember anything about the switchlight that night."   Against this very weak negative testimony the following witnesses testified positively that it was burning.   Moore, the engineer on the freight train, "I remember distinctly that it was burning

that night"; "it showed white when I came up to it, and after I threw the switch it showed red. It showed red to-wards the Union Station also after I threw the switch, but before that time it showed white. I had no trouble in seeing it; it was burning when I passed there and when I came up to it." Harris, engineer of the switch engine, pushing the freight train, way back at the rear, testified that he did not see the light, "I went up to the engine but I did not look at the light." Faulkes, roadmaster, testified that when he arrived at the scene of the wreck the light was burning, *show-ing red light up and down the main line;* that the switch was turned to the cut-off track. E. H. Smith, track super-visor, testified that he arrived at the wreck about ten min-utes after the collision; "the first thing I did when I drove up, was to look at the light. *It was burning,"* that watching the lights was his job, and he wanted to see if he had been at fault, and for that reason particularly noticed the light. Long, the engineer of the following engine, testified that at first he did not notice the light, but that, about an hour and a half afterwards, he noticed that the light was burning and *showing red to the main line;* that at the time of the acci-dent he could not see the light from where he was. J. H. Hunt, fireman for Long, testified that he noticed the switch-light and that it was burning.

The evidence of the absence of the light, offered by the plaintiff, was entirely of a negative character; "did not look," "did not see," "did not notice," "don't remember." The general rule as to the admissibility of this kind of tes-timony, and whether or not it has sufficient probative value to constitute some evidence of the fact at issue, is thus ex-pressed by Mr. Wigmore (Volume 1 [1st Ed.], § 664):

"The only requirement is that the witness should have been *so situated* that in the *ordinary course of events* he would have heard or seen the fact had it occurred." 23 C. J., 40, § 1789.

There is an obvious difference between hearing and seeing, in this connection. The one is involuntary; the sound is forced upon the faculty of hearing, and, if a witness should testify that he was in a position to hear certain sound if it had been made, but did not hear anything, clearly the testimony is admissible for what it is worth. It would answer the rule above stated. But vision is subjective, voluntary, a matter of positive effort. If a witness should testify that, although he was in a position to see a certain condition, but did not look, did not notice, his testimony that he did not see it does not comply with the rule; he was not "so situated" that he would have seen, and it was not at all in the "ordinary course of events" that one who did not look, did not notice, would have seen.

The admissibility of such evidence of failure to hear or see depends upon proof of circumstances showing a probability, a likelihood, that the witness would have heard or seen the fact in issue, if it had occurred.

As to sound it has been said:

"Where his position is such that the sound would have been likely to attract his attention if the bell had been rung, his failure to hear it is some evidence that there was no ringing." *Slattery v. N. Y., N. H. & H. R. Co.,* 203 Mass., 453; 89 N. E., 622; 133 Am. St. Rep., 311.

In *Uggen v. Bazille,* 123 Minn., 97; 143 N. W., 112, it is held:

"In order to prove that an instruction or warning was not given by the testimony of a witness that he did not hear it, the one proffering such testimony is ordinarily required to show, as a condition to its reception, that the circumstances were such that the witness probably would have heard the instruction or warning, had it in fact been given."

In *Cotton v. Willmar & Sioux Falls R. Co.,* 99 Minn., 366; 109 N. W., 835; 8 L. R. A. (N. S.), 643; 116 Am. St. Rep., 422; 9 Ann. Cas., 935, the rule is very clearly stated:

"Therefore, when it is sought to prove the nonexistence of sound by the testimony of witnesses the conditions essential to the competency of the evidence must be supplied. The probative value to be given to the fact that a witness did not hear the sound depends upon the condition of his senses, his proximity to the place, the degree of attention, and other such circumstances which render it more or less probable that, if the sound had been made, the witness would have heard it. Hence the mere statement of a witness that he did not hear a bell ring is valueless as evidence, unless it further appears that he was able to hear and was in a position and under conditions where he would probably have heard the sound had it been made."

"Negative testimony is valueless, unless it appears that the witness was so circumstanced as to be reasonably likely to have some knowledge on the subject." *Fletcher v. Hickman,* 165 F. 403; 91 C. C. A., 353.

"Probative force is accorded to negative testimony, where the opportunity of the witnesses to receive knowledge of the fact is approximately equal to that of witnesses who give positive testimony concerning gift, but where, because of an impaired sense or of an admitted lack of attention, the opportunity of the witness who did not see or hear is not equal to that of a witness who did, the testimony of the former is devoid of evidentiary strength." *Williamson v. Wabash R. Co.,* 139 Mo. App., 481; 122 S. W., 1113.

In 2 Moore Facts, § 1188, it is stated:

"If a credible witness with apparently adequate opportunity of observation, testifies to the occurrence of a fact, no conflict arises by the testimony of other witnesses that they were cognizant of the occurrence, when the latter witnesses' opportunities for observation are not stated, or where it affirmatively appears that their situation was such or their attention was so engrossed with other matters, that they probably would not have observed the fact if it had occurred, or when their opportunities were not co-extensive

with those of the witnesses who testify positively to the fact."

"Where witnesses who were in a position to hear testify affirmatively and positively that they did hear a bell or whistle, the testimony of other witnesses that they did not hear it raises no conflict of testimony for submission to a jury unless it clearly appears that those who say they did not hear were in such a position, and were giving such attention that they most probably would have heard the sound had it occurred." *Lehigh R. Co. v. Mangan* (C. C. A.), 278 F. 85.

In *Davis v. Payne,* 120 S. C., 473; 113 S. E., 325, it is held that testimony by witnesses that they did not hear any signals sounded by the train which struck decedent is of no weight where a long freight train was passing with considerable noise on the adjoining track, and was itself sounding whistle signals, so that the failure of the witnesses to hear the signals was no indication that they were not given.

The usual practice in the examination of a witness offered to give this negative testimony is to follow his statement with the further question: Would he have heard the signals if they had been given? There is a conspicuous absence of such inquiry in the present case. Would the witness have seen the light burning if such had been the fact? Doubtless the plaintiff would have received an answer consistent with the statement that the witness had not looked, did not notice.

If the hearing of the witness was good, if he was in a position to hear a sound if made, circumstances rendering it probable that if it had been made he would have heard it, his testimony that he did not hear it will be received as evidence of some probative value. The involuntary, receptive character of the faculty of hearing renders it not only probable that he would have heard it but improbable that he would not. It is not so with the faculty of vision; and this essential difference in the two faculties makes it nec-

essary, in order to render admissible negative testimony that the witness did not see, that some other circumstance than his position in a place where he could have seen be introduced. As the mere statement of a witness that he did not hear, in the absence of other circumstances, would be valueless, so the mere statement that he did not see would be equally so; particularly as in this case where the statement is accompanied by the further statement that he did not look, a circumstance that not only fails to supply the necessary element of probability, but actively presents one of improbability. There is not a single circumstance connected with the proponents of this negative testimony, which, in addition to their position, renders it probable that if the light had been burning they would have seen it. Such testimony should be inconsistent with the fact that the light was burning, whereas it is entirely consistent with the fact. My conclusion, therefore, is that there was no evidence at all against the positive testimony of the witnesses for the defendant to the effect that the light was burning and showing red down the track upon which McAlister was running his engine. There being no testimony on the part of the plaintiff that the light was not burning, and all of the evidence being one way, that it was burning and showing red to the main line, under the rule declared in *Herndon v. Southern Railway Co.,* 118 S. C., 466; 111 S. E., 13, the Court may assume as true the fact thus evidenced. It thus appears that McAlister with the red light in full view, showing that the switch was set to the cut-off track, ran his engine into the freight train emerging from that track, and was the author of his own death. ·

But for the sake of the argument let us assume that the lamp on the switch target was not burning at the time of the collision. We have then this situation: There is no suggestion that the light was showing white to the main line, the only condition that justified him in going forward; it was dead, showing neither white nor red. There was evi-

dence to the effect that a dead signal is a red signal, a peremptory order to stop. He had abundant opportunity of ascertaining that fact, if it was dead, and under the rules he was obliged to operate his engine so that he could stop it in half the distance of his vision. The fireman, Turnipseed, testified that—

"I knew the long barrel (freight train) was going north from Andrews yard, and I was looking out for that."

If Turnipseed knew that the freight train was due to come out of the cut-off on to the main line, that it was the train McAlister was warned to look out for ahead, did not McAlister know it? And, even if the switch light was out, a fact which could have been ascertained 200 yards away, his taking the chance was his assuming the risk.

In the *Horton Case* it is said:

"These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them."

McAlister was charged, not only with that caution, but was particularly warned of the presence of the freight train ahead of him, and, under the circumstances of the operation of the Block system, charged with the utmost caution.

Could there be a doubt that, if the collision had resulted in the death of a train hand on the freight train, or of one of the employees riding with McAlister, the negligence of McAlister would have been held the proximate cause of the death of such employee?

A similar case to this hypothesis is *Pittsburg R. Co. v. Sudhoff* (Ind. App.), 88 N. E., 702. There the brakeman of an engine crew, entering a switch and standing upon a side track to let a freight train pass, failed to close the switch after the engine had pulled in on the side track. The freight engineer knew that the engine was on the side track, and, notwithstanding the switchlight was out, which,

under a rule of the company, was a signal for him to stop, proceeded and entered upon the side track at such speed that he was unable, after discovering that the switch was open, to prevent a collision with the standing engine, resulting in the death of its engineer. The Court held that the negligence of the freight engineer in proceeding without a signal to do so was the proximate cause of the collision, and that the negligence of the brakeman in failing to close the switch was merely cooperating or incidental.

9. It is claimed that the presence of the freight train in a deep cut was an act of negligence. The testimony is that at the deepest part of the cut the freight train could have been seen, and, if not, no one knew the situation better than McAlister, who, with Turnipseed, knew that the train was upon that very track as they approached it from the Union Station.

10. It is claimed that the use of a wooden cab instead of a steel one was an act of negligence. Concede that a steel cab would have prevented a fatal termination of the collision it certainly would not have prevented the collision, and, if an act of negligence, it was clearly an assumed risk.

I think for these reasons that the motion of the defendant for a directed verdict should have been granted.